IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LISA MOWERY,

                              Plaintiff,

    v.                                                      OPINION & ORDER

METROPOLITAN LIFE INSURANCE                   16-cv-516-jdp
COMPANY and DIGNITY HEALTH'S HEALTH
AND WELFARE PLAN,

                              Defendants.

---

Plaintiff Lisa Mowery worked as the lead registered nurse in French Hospital's Intensive Care Unit and Critical Care Unit until she had a series of allergic reactions, leading to several emergency room visits. Since then, Mowery has stopped working, sought treatment from a number of doctors, and started a daily regimen of numerous antihistimines and other medications. Despite her efforts, she still suffers allergic reactions. Mowery and her doctors are not sure exactly what causes these reactions, although tests indicate that she is allergic to at least two chemicals found in a number of common products.

Mowery submitted a claim for long-term disability benefits under defendant Dignity Health's Health and Welfare Plan, administered by defendant Metropolitan Life Insurance Company. Defendants denied Mowery's claim. Mowery filed this suit, claiming that their decision violated her rights under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). The parties have filed cross-motions for summary judgment. Dkt. 13 and Dkt. 17. The denial of benefits was based almost exclusively on the opinion of MetLife's independent physician consultant, Dr. Lin. But Dr. Lin's reports contained fundamental errors and disregarded some of the evidence provided by Mowery's treating physicians. The court

concludes that defendants arbitrarily and capriciously denied Mowery benefits. The court will grant Mowery's motion, deny defendants' motion, and remand for further administrative proceedings consistent with this opinion.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Mowery is a registered nurse. She worked for Dignity Health as the lead registered nurse in French Hospital's Intensive Care Unit and Critical Care Unit. As a Dignity Health employee, Mowery was eligible for coverage under Dignity Health's Health and Welfare Plan. The plan is covered by ERISA. MetLife is the claims administrator for the plan. Dignity Health and MetLife both have discretionary authority to administer the plan.

On March 4, 2013, Mowery had an allergic reaction while working in the Intensive Care Unit and went to the emergency room for treatment. Mowery already knew that she was allergic to bee venom, latex, and several kinds of antibiotics, but neither she nor her doctors knew what caused the March 4 reaction, so she began working in the education area of the hospital until she could determine the cause. While working in the education area on March 26, she had another allergic reaction and went to the emergency room for treatment. Mowery did not return to work until after she met with an allergist, Dr. Helen Mawhinney, who told Mowery that she could return to work.

On Mowery's first day back at work, April 26, she had another allergic reaction. She took medications to control her symptoms, finished her shift, and returned home. But in the middle of the night, she woke up with more severe symptoms and went to the emergency room. At that point, Mowery decided not to return to work. On December 3, she applied by phone

2

for long-term disability benefits under the plan, claiming that "allergies to gloves and paper and glue" prevent her from working. Dkt. 12-15, at 15.

## A. The plan's definition of disability

To receive long-term disability benefits, Mowery had to provide evidence that she was disabled as defined by the plan, that is, that "as a result of Sickness or injury," she was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way." Dkt. 12, at 27.

The plan defines "Substantial and Material Acts" as "the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified." *Id.* at 28. The plan defines "Usual Occupation" as "any employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the employer when the Disability began. Usual Occupation is not necessarily limited to the specific job that You performed for the employer." *Id.*

## B. Mowery's claim record

Over the next year and a half, Mowery provided medical records and other documents to support her claim. By the time MetLife made its final determination about Mowery's eligibility for long-term disability benefits, it had the following documents before it.

### a. March 4, 2013 emergency room records

Records from Mowery's March 4 visit to the emergency room indicate that she had an "acute anaphylactic reaction," including the following symptoms: "a diffuse, pruritic, red, raised rash along her entire body and her face, tongue swelling," as well as "5/10 chest pressure, anxiety, . . . . borderline hypoxic . . . . [d]iffuse urticarial hives throughout face, chest, back and

extremities." Dkt. 12-14, at 5-6. Mowery was immediately administered epinephrine, Benadryl, Zantac, and other allergy medicines and monitored in the ER for four hours.

### b. March 26, 2013 emergency room records

Records from Mowery's March 26 visit to the emergency room indicate that she had a "[r]ash consistent with allergic reaction," and describe her symptoms as "circumferential erythema to the bilateral hands up to the wrists [and] non-raised erythema and some welts on her back, some hives on her back [and] erythema that is just, again, flat, non-raised in the nape of her neck." Dkt. 12-14, at 8. She was administered antihistamines and observed for 45 minutes, at which point her symptoms had resolved.

### c. Dr. Mawhinney's April 2, 2013 report

Mowery saw Dr. Mawhinney, an allergist, on April 2 to determine the cause of her recent allergic reactions. Dr. Mawhinney performed a blood test "to a panel of environmental allergens." Dkt. 12-13, at 83. "Somewhat surprisingly, given the patient's history, there were no positive reactions." *Id.* Dr. Mawhinney noted that because "there is no obvious explanation for the patient's episodes of anaphylaxis, I believe that she requires maximum protection from symptoms." *Id.* Mawhinney stated that Mowery could "return back to work on 04/26/2013." Dkt. 12-10, at 23.

### d. April 27, 2013 emergency room records

Records from Mowery's early-morning visit to the emergency room on April 27 indicate that she had "hoarse voice, itching, redness of skin, [and a]bdominal cramps." Dkt. 12-14, at 9. The records list a differential diagnosis of "anaphylaxis, Mastocystosis urticaria" and note that an allergic reaction is "suspected." *Id.* at 9, 10. They indicate that Mowery had taken Benadryl and epinephrine before arriving at the hospital. A blood test for tryptase (a serum

4

associated with anaphylactic reactions) was performed shortly after Mowery arrived. The results indicated that Mowery's tryptase levels were within the normal range.[1] Dkt. 12-14, at 21. Mowery was discharged from the hospital about an hour and a half after she arrived with instructions to avoid her "work environment" until she could be evaluated further. *Id.* at 11.

### e. June 7, 2013 emergency room records

Mowery visited the emergency room again on June 7, 2013, after taking Benadryl and epinephrine at home. The records note "flushing" on Mowery's arms and chest. Dkt. 12-14, at 14. They indicate that Mowery's symptoms gradually resolved and that she asked to be discharged about an hour and a half after she arrived. The treatment provider agreed that discharge was appropriate because "her exam is completely normal and not worrisome for anaphylaxis or angioedema." *Id.* at 14-15.

### f. Dr. White's January 31, 2014 Attending Physician Statement

Mowery's primary care physician, Dr. Klyda White, completed an Attending Physician Statement (APS) form supplied by MetLife on January 31, 2014, in which she describes Mowery's condition as "fixed and stationary." Dkt. 12-14, at 31. In response to the question "Have you advised your patient about when they can return to work?" Dr. White stated "Yes" and listed "Permanent" as the date of return. *Id.* (Later, Dr. White explained that she was confused by the question and meant to indicate that Mowery's "inability to return to work was permanent." Dkt. 12-10, at 8.)

---

[1] Mowery argues that although the levels were within the normal range, they were elevated (an indication of an anaphylactic reaction) as compared to Mowery's baseline tryptase levels.

### g. Dr. McLean's August 5, 2013 report

Mowery underwent several patch tests to identify contact allergens and met with Dr. Arthur McLean on August 5 to discuss the results. In his report, Dr. McLean notes that the tests revealed positive results for p-tert butyl phenol formaldehyde resin (PTBP-FR)[2] and methyldibromo glutaronitrile (MDBGN).[3] In addition, Mowery exhibited "strong reactions" to the glue applied to keep the patch test attached to the skin. Dkt. 12-13, at 93. Although Dr. McLean's report does not mention this, the lab report for one of the patch tests indicates that Mowery exhibited "macular erythema" (a rash) in response to mercaptobenzothiazole (MBT).[4] Dkt. 12-13, at 21. A patch test was also performed with "small pieces of the Nitrile gloves." Dkt. 12-13, at 93. The results were negative.

Dr. McLean noted that Mowery's "more serious" anaphylactic episodes "seem to occur more commonly in environments where Nitrile gloves have been utilized. As noted the tests to small pieces of Nitrile gloves was negative but the [patch] test was positive to [MDBGN,] which could represent a degraded antigen resulting from chronic use of Nitrile gloves." Dkt.

---

[2] According to Mowery, PTBP-FR is found in a number of everyday products including adhesives, EKG monitoring electrodes, inks, fabric, cosmetics, insecticides, deodorants, and commercial disinfectants. Defendants acknowledge that PTBP-FR is found in resins and glues but otherwise dispute Mowery's proposed fact. But the dispute is immaterial.

[3] According to Mowery, MDBGN is a preservative found in numerous products including lotions, soaps, toilet paper, sun screen, and ultrasonic gels. Defendants dispute Mowery's proposed fact on the basis that her sources are general and "do not contain information specific to" Mowery. Dkt. 30, ¶ 166. But the dispute is immaterial.

[4] According to Mowery, MBT is commonly found in products such as nitrile and neoprene medical gloves, masks, bed sheeting, and anesthesia equipment. Defendants dispute Mowery's proposed fact on the basis that her sources are general and do "not contain information specific to" Mowery. Dkt. 30, ¶ 154. But the dispute is immaterial.

12-13, at 26-27. Dr. McLean instructed Mowery to "avoid areas where nitrile gloves have been used due to [her MDBGN] sensitivity." *Id.* at 27.

### h. The August 12, 2013 denial of Mowery's worker's compensation claim

An August 12, 2013 letter from the worker's compensation claim administrator indicates that Mowery's claim was denied based on a report by a qualified medical evaluator, Dr. Yu-Luen Hsu, that Mowery's "allergic reactions were not likely caused by any work event, specifically not exposure to nitryl gloves." Dkt. 12-13, at 73. The administrator noted that Dr. Hsu "would be happy to review any additional medical evidence that has been obtained in regard to allergy testing regarding the nitryl gloves" and issue an updated report. *Id.*

### i. Mowery's September 5, 2014 appeal letter

When MetLife initially denied her claim, Mowery wrote a letter requesting an appeal. In the letter, Mowery detailed her medical history and explains that because of her allergies to latex, PTBP-FR, MDBGN, and MBT, she cannot perform her job because "[w]earing gloves during patient care is required by federal law," and she cannot "wear or be in a room with" any type of glove. Dkt. 12-13, at 47. She stated that she "can no longer work in the hospital, a clinic, an office, or even in other people's homes doing home care." *Id.* at 47-48. She claimed that she was told by a human resources representative that she could not work for the hospital from home because she "would have to be available for meetings at the hospital, [so] they could not accommodate [her] limitations." *Id.* at 48.

### j. Dr. McLean's October 1, 2014 letter

On October 1, 2014, Dr. McLean sent MetLife a letter explaining that Mowery "has demonstrated positive contact patch test responses to both [PTBP-FR] and [MDBGN], both of which are high risk exposures in the hospital setting due to a wide variety of furniture and

7

equipment. Her lung function testing is now showing small airways type asthma . . . . She also reports periodic issues with hives and rhinitis which are always worse in the hospital environment. . . . [T]hese respiratory problems . . . clearly increase when she goes back to her occupational environment . . . ." Dkt. 12-13, at 36.

### k. Dr. Lin's October 28, 2014 report

After receiving Mowery's appeal, MetLife asked Dr. Robert Lin, an allergist, to prepare an independent physician consultant report. Dr. Lin reviewed the available medical records and Dignity Health's job description for "Staff Registered Nurse II." Dkt. 12-12, at 76. Dr. Lin attempted to contact Dr. McLean and Dr. Mawhinney but was unsuccessful.

Dr. Lin recounted Mowery's medical history and noted that her allergic reactions were "attributed to the use of nitrile gloves and latex" but that a patch test with nitrile gloves yielded a negative reaction. Dkt. 12-12, at 82. He opined:

> [T]here is no evidence that [Mowery] has a documented hypersensitivity to work related exposure. There is no evidence of mastocytosis or recurrent anaphylaxis. There is no clinical evidence of a work disability from an allergy/immunology point of view. Therefore, the medical information does not support functional limitations as of 04/27/2013.
>
> . . . .
>
> [Nor is there] clinical evidence to support restrictions or limitations and/or side effects resulting from the medications (if [Mowery] is taking any medication) during the period from 04/27/2013 continuously to present from an allergy/immunology perspective.

Dkt. 12-12, at 83.

### l. Dr. Braskett's November 25, 2014 report

When Dr. Mawhinney retired, Dr. Melinda Braskett, another allergist, began to treat Mowery. Dr. Braskett's records from her November 25, 2014 visit with Mowery indicate that

8

since March 2013, Mowery had allergic reactions requiring treatment with epinephrine on seven different occasions. Dr. Braskett noted that "either idiopathic anaphylaxis or mast cell disorder are most likely, as it is difficult to attribute these [anaphylactic episodes] to specific allergic trigger." Dkt. 12-10, at 31. Mowery's "multiple antibiotic allergies may also be supportive of this diagnosis." *Id.* at 31-32. When Mowery asked Dr. Braskett for a letter stating that she was unable to return to work, Dr. Braskett commented:

> I support that given her repeated episodes of anaphylaxis and the nature of her work. I have to work with her primary care physician to find an acceptable treatment plan, but it is unlikely that she will be able to return to work in the Intensive Care Unit given the nature of side effects such as sedation from the medication she requires.

*Id.* at 32. Dr. Braskett also instructed Mowery to "continue current environmental avoidance" as well as daily doses of antihistamines and other medications. *Id.* at 33.

### m. Dr. White's February 6, 2015 letter

On February 6, 2015, Dr. White sent MetLife a letter explaining that after Mowery's March 4 anaphylactic episode, Dr. White referred her to an allergist and "recommended a change in her work environment." Dkt. 12-10, at 2. In the letter, Dr. White disputed Dr. Lin's assessment that Mowery did not have an anaphylactic reaction. She explained that the common definition of anaphylaxis is the "rapid onset of allergic symptoms involving two or more organ systems." *Id.* at 3. She noted that Mowery's documented allergic reactions involved "the cardiac, GI, [and] intergumentary systems, meeting the criteria of anaphylaxis." *Id.* She explained that "every single anaphylactic event represents a potential threat to the life, safety, and well-being of a patient, and must always be taken seriously, and immediately treated. Patients have been known to die of anaphylaxis even when their initial symptoms did not appear that severe, or appeared initially under control. Patients with a history of asthma are

9

especially at risk of death from anaphylaxis." *Id.* Mowery's "long asthma history and the nature of her reactive airway disease put her at higher risk from death from anaphylaxis." *Id.* at 6.

Dr. White noted that Dr. Mawhinney diagnosed Mowery with idiopathic anaphylaxis, Dr. Braskett diagnosed idiopathic anaphylaxis/mastocytosis, and Dr. McLean diagnosed type 1 allergic reactions to nitrile and PTBP-FR. She stated that "there is no way to resolve the dispute between" these doctors, but that the difference in diagnoses "makes little difference in her treatment," nor does it "change the fact that [Mowery] has suffered three reactions in the workplace . . . ." *Id.* at 7. She also explained the reasoning behind her opinion that Mowery cannot return to work: (1) Mowery cannot be in a hospital without the "risk of severe physical harm," (2) the hospital contains many items containing PTBP-FR that she may be allergic to, (3) she cannot use latex or nitrile gloves because of her allergies, and (4) she cannot care for critically ill patients while under the influence of sedating antihistamines or while she is having an allergic reaction. *Id.* at 8-9.

### n. Dr. Lin's February 25, 2015 report

After receiving additional documentation from Mowery, MetLife asked Dr. Lin to review her claim again. Dr. Lin did so and stated:

> The additional documentation does not change my prior determination or opinion . . . .
>
> . . . .
>
> [Mowery] claimed allergies to many substances including latex and nitrile, which are glove components, yet her [blood test] to latex was negative and the [patch] test to nitrile was negative.
>
> The only positive test was for [PTBP-FR], which is only found in various resins/glues (not paper or soap or plastic garments) and gives contact dermatitis, not anaphylaxis. . . .
>
> . . . .

10

> There is no evidence that [Mowery] has a physical condition that disables her from work. There is also no documentation that medications that she is taking disable[] her from work.

Dkt. 12-7, at 22-23.

### o. Dr. Braskett's April 2, 2015 letter and report

Mowery visited Dr. Braskett on April 2, 2015. Dr. Braskett's records of the visit note, "Multiple episodes of anaphylaxis, either idiopathic anaphylaxis or mast cell disorder are most likely, as it is difficult to attribute these to specific allergic trigger." Dkt. 12-1, at 53. The records also note that "[i]t is unlikely that [Mowery] will be able to return to work in the Intensive Care Unit given the nature of side effects such as sedation from the medication she requires." *Id.* at 54.

Dr. Braskett wrote a letter the same day stating, "I find it difficult to believe that Lisa Mowery's claim has been denied. . . . Her records support a diagnosis of idiopathic anaphylaxis, asthma and possibly a mast cell activating disorder." Dkt. 12-1, at 47.

### p. Dr. McLean's April 2015 letter

In an April 2015 letter, Dr. McLean responded to Dr. Lin's reports. In the letter, Dr. McLean stated, "I have some reservations about [Dr. Lin's] conclusions, although I admit that [Mowery] has findings that can't be easily categorized into a cause and effect category." Dkt. 12-1, at 25. He explained that although Mowery's tryptase test came back negative, it may have been a false negative. He noted that her treatment providers in the emergency room diagnosed her with possible anaphylaxis. And he opined that even if she does not have anaphylaxis, her treatment providers have confirmed hives and tongue swelling. "[I]f a patient develops hives and respiratory symptoms, such as tongue swelling, this can impair one's ability to function in the critical care setting." *Id.* He admitted that he has "no special training in

determining how environmental factors actually impair one's ability to complete a work related task, and how one weighs those factors in work related disabilities." *Id.*

### q. Dr. Lin's May 21, 2015 report

MetLife asked Dr. Lin to review Mowery's claim once again after conferring with Mowery's treating physicians. Dr. Lin attempted to contact Dr. Braskett and Dr. White, but was unsuccessful. Dkt. 12, at 244. Nevertheless, he reviewed the additional information received after his February 25 report and offered a new opinion:

> I agree with Dr. Braskett that the allergy test results did not explain [Mowery's] symptoms. In fact, the only positive test was for [PTBP-FR] with [MBT] having erythema. The latter is the only contact allergen that has a link to nitrile glove, and when the nitrile glove was used in [patch] testing the result was negative. A PubMed search for the 2 contact allergens noted plus anaphylaxis revealed no citations. The March & April 2013 emergency department (ED) visit treatments did not include epinephrine which[,] given the low threshold for ED physicians to treat anaphylaxis[,] strongly suggest that the ED physicians did not feel the claimant had anaphylaxis. The latter ED visit was only 2 hours. This also suggests that the ED physicians did not feel the claimant had anaphylaxis as the 2005 guidelines suggest that an anaphylaxis patient be observed 4-6 hours. . . . In summary, the support of the claimant having either systemic sensitivity to a contact allergen or mast cell activation syndrome is not supported.

Dkt. 12-1, at 1.

### C. MetLife's final determination

On June 1, 2015, MetLife completed its final review of Mowery's claim and upheld its decision to deny the claim. It concluded that the information provided by Mowery did not show that Mowery was disabled as defined by the plan. It described Mowery's job and the substantial and material acts necessary to pursue that job:

> Mowery's job as a Registered Nurse was medium level demand job which required her to manage quality patient care through the

12

> nursing process, coordinate the plan of care with the health care team, and assume a leadership role for unit personnel to prepare and assist with them with their responsibilities. The job . . . . anticipated exposure to blood borne pathogens, chemicals, airborne communicable diseases, extreme temperatures, radiation, uneven surfaces or elevations, extreme noise levels, dust or particulate matter.

Dkt. 12, at 222. It relied heavily on Dr. Lin's May 21, 2015 report and concluded that "[w]hile we do not dispute that Ms. Mowery has had allergic reactions, [Dr. Lin] opined the medical information did not support function limitations, therefore, she did not meet the definition of disability per the Plan as of April 27, 2013." Dkt. 12, at 225.

JURISDICTION AND VENUE

The court has subject matter jurisdiction under 28 U.S.C. § 1331 because the case arises under federal law and under 29 U.S.C. § 1132(e), which confers jurisdiction on the district courts for ERISA claims.

Venue is more problematic. Although 29 U.S.C. § 1132(e)(2) allows an ERISA case to be brought in any district where a defendant resides or can be found, this case has no connection whatsoever to this district. Mowery lives and worked for Dignity Health in California. MetLife's principal place of business is in New York. Although MetLife is licensed to sell disability insurance in Wisconsin, and may be subject to general jurisdiction in Wisconsin, *but see BNSF Railway Co. v. Tyrrell*, No. 16-405, 2017 WL 2322834, at *9-10 (May 30, 2017), none of MetLife's acts in this case have any bearing on Wisconsin or this district. The only Wisconsin connection is that plaintiff's attorneys practice in New Berlin (in the Eastern District of Wisconsin), but the location of counsel is irrelevant. Objections to venue and personal jurisdiction are waivable, and neither MetLife nor Dignity Health has objected to

having this case decided in the Western District of Wisconsin. So venue is technically proper here, even though it does not make much sense.[5]

ANALYSIS

MetLife's denial of benefits was based fundamentally on Dr. Lin's opinion that Mowery did not face a risk of life-threatening anaphylaxis as her physicians claimed, but that she suffered only from a relatively mild allergy that would not interfere with her continued employment as a nurse. The parties agree that the court's review is limited to the record available to MetLife, and that MetLife's determination was discretionary, and thus it must be upheld unless it was arbitrary and capricious. So the dispositive question here is whether Dr. Lin reached a reasonable conclusion based on a fair review of the record.

Given that review is limited to the record available to MetLife, the potential for factual disputes is sharply limited, so summary judgment is an appropriate procedural vehicle to decide the case.[6] Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the

---

[5] Counsel should be forewarned: if in future cases there is no plausible connection to this district, the court may ask counsel to show cause why the case should not be transferred. *See, e.g., Advanced Turf Solutions, Inc. v. Johns*, 16-cv-2769, 2016 WL 6996219 (S.D. Ind. Nov. 30, 2016).

[6] Defendants move for judgment under Federal Rule of Civil Procedure 52(a), a "trial on the papers," and for summary judgment under Rule 56 in the alternative. Perhaps deciding the case under Rule 52 would be more efficient in some cases, *see Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991-92 (N.D. Ill. 2003), but here, the parties have fully briefed their motions as summary judgment motions, and there are no genuine disputes of material fact, so the court will proceed under Rule 56.

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party cannot create such a dispute, summary judgment against that party is appropriate. "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

Under ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties agree that this court should use the arbitrary and capricious standard of review when analyzing MetLife's denial of benefits because the plan grants discretionary authority to MetLife to make all benefits determinations.

Arbitrary-and-capricious review focuses on the reasonableness of the denial of benefits; it "turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33

15

(7th Cir. 2009)). This standard of review "is not a euphemism for a rubber-stamp." *Id.* at 483. The scope of the court's review is limited to the record that MetLife had before it at the time that it made the benefits determination. *See Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994).

In *Majeski*, the Seventh Circuit held that it is arbitrary and capricious "for a plan administrator 'simply [to] ignore' a treating physician's medical conclusion and to 'dismiss [other] conclusions without explanation.'" 590 F.3d at 484 (quoting *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009)). In that case, MetLife denied the plaintiff's long-term disability benefits claim and based its decision solely on its expert's report. That expert did "not acknowledge, must less analyze, the significant evidence of functional limitations" provided by the plaintiff and erroneously characterized some of the plaintiff's records. *Id.* at 483. The Seventh Circuit concluded that MetLife's denial was arbitrary and capricious and remanded the claim to MetLife.

This case presents a similar scenario. It is not possible to offer a reasoned explanation, based on the record, for MetLife's decision to deny Mowery benefits. MetLife explicitly based its decision on Dr. Lin's May 21, 2015 report. But it was unreasonable to blindly follow Dr. Lin's conclusion that Mowery did not have "either systemic sensitivity to a contact allergen or mast cell activation syndrome," Dkt. 12-1, at 1, because, just like the expert in *Majeski*, Dr. Lin does not acknowledge or analyze the significant evidence on the record supporting a contrary conclusion.

Dr. Lin's report contains multiple material errors and omissions. Dr. Lin stated that Mowery was not treated with epinephrine during her March and April 2013 visits to the emergency room and concluded that this "strongly suggest[s] that the ED physicians did not

16

feel [Mowery] had anaphylaxis." *Id.* But the record indicates that Mowery *was* treated with epinephrine during her March 4 emergency room visit and that she self-administered epinephrine before arriving at the emergency room on her April 27 and June 7 visits. In fact, the March 4 emergency room records describe Mowery as having an "acute anaphylactic reaction." Dkt. 12-14, at 6. The record indicates that Dr. Mawhinney, Dr. Braskett, and Dr. White each diagnosed Mowery with anaphylaxis, but Dr. Lin ignores these diagnoses. And Dr. Lin completely ignores the conclusions, independently reached by at least four of Mowery's treatment providers who had responded to Dr. Lin's previous rejections, that even if Mowery's allergic responses did not constitute full-fledged anaphylaxis, her allergic reactions were nevertheless severe enough to render her unable to return to work.[7]

MetLife's singular reliance on Dr. Lin's report is unsustainable, especially given MetLife's acknowledgement that Mowery "has had allergic reactions," Dkt. 12, at 225, which undermines MetLife's reliance on Dr. Lin's conclusion that Mowery does not have a "systemic sensitivity to a contact allergen." Dkt. 12-1, at 1.

Dr. Lin focused heavily on Mowery's lack of reaction to the nitrile patch test, and the fact that no one had identified the specific workplace allergen that was causing her reactions. But neither Dr. Lin nor MetLife analyzed how Mowery's documented allergic reactions affected her ability to perform with reasonable continuity the important tasks, functions, and operations of a registered nurse. Under the plan, that is the inquiry that MetLife must

---

[7] In his February 25, 2015 report, Dr. Lin acknowledges that Dr. Braskett stated that "it was unlikely that [Mowery] could return to her work in the ICU," Dkt. 12-7, at 22, but frames the comment in such a way as to indicate that Dr. Braskett did *not* support Mowery's continued leave from work, when in fact the opposite was true: Dr. Braskett explicitly supported Mowery's decision to not return to work.

undertake to determine if Mowery is disabled and entitled to long-term disability benefits. So even if no specific workplace substance had been shown to cause Mowery's allergic reactions, the issue of whether Mowery is capable of adequately performing her job functions must be addressed, given the apparent likelihood that Mowery will have another allergic reaction and the multiple medications that Mowery takes on a daily basis. There is ample reason to believe that Mowery can no longer perform her job adequately, as Mowery and several of her doctors claim.

"[A] plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Majeski*, 590 F.3d at 484. By adopting Dr. Lin's report without further analysis, MetLife did just that. MetLife's determination was arbitrary and capricious, so the court will grant Mowery's summary judgment motion and deny defendants' summary judgment motion. Just as the Seventh Circuit did in *Majeski*, the court will remand Mowery's claim for further findings or explanations.

ORDER

IT IS ORDERED that:

1. Plaintiff Lisa Mowery's motion for summary judgment, Dkt. 17, is GRANTED.

2. Defendants Metropolitan Life Insurance Company and Dignity Health's Health and Welfare Plan's motion for summary judgment, Dkt. 13, is DENIED.

3. This case is remanded to defendants for further administrative proceedings consistent with this opinion.

Entered June 2, 2017.

> BY THE COURT:
>
> /s/
> _____
> JAMES D. PETERSON
> District Judge